## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JEVIC HOLDING CORP., et al., | ) | Case No.  08-11006 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| CENTRAL FREIGHT LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 08-51062 (BLS) |
| | ) | |
| v. | ) | |
| | ) | |
| JEVIC TRANSPORTATION, INC., | ) | Re: Adv. Docket Nos. 1, 20 & |
| | ) | 42 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### OPINION[1]

Before the Court is the motion of Central Freight Lines, Inc. ("Central") for partial summary judgment (the "Motion")[Docket No. 42]. Central argues that certain funds held by the Debtors are not property of the estate, but are held in trust for the benefit of Central, pursuant to the Third Circuit's Interline Trust Fund Doctrine. Because genuine issues of material fact remain with respect to the appropriate application of the Interline Trust Fund Doctrine to this case, the Court concludes that Central is not entitled to summary judgment. The Motion will be denied.

---

[1]    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Civil Procedure 7052.

1

## I.  <u>BACKGROUND</u>

Jevic Transportation, Inc. ("Jevic"), together with Jevic Holding Corp. and Creek Road Properties, LLC (collectively, the "Debtors") each filed voluntary petitions for bankruptcy relief in this Court on May 20, 2008.  Jevic is a trucking company that provided regional and interregional delivery of goods across the United States and Canada.  In the course of its business, Jevic entered into contracts with various carriers to receive goods from Jevic's trucks at terminal locations and transport those goods to their final destinations.  Central was one such carrier.

Central and Jevic were party to a "Cartage Agreement" and accompanying "Contract Between Central Freight Lines, Inc. and Jevic Transportation" (collectively and as amended, the "Agreement")[Docket No. 1, Ex. A].  Pursuant to this Agreement, Central and Jevic agreed that Central would receive goods from Jevic at specified interchange points, and transport the goods from those interchange points to the customer.  Revenue from the shipment would then be split between the parties according to RMB D-83 series division sheets, which are schedules commonly used in the industry to divide revenue among carriers based on mileage, origin, interchange, and destination.  <u>See</u> Dep. of Carol Alexander, Controller of Jevic, Docket No. 43, Ex. A, 43:10-13. The parties' practice was for Jevic alone to contact customers for payment.  (Alexander Dep. 75:7-11).  Jevic would remit to Central the amount it was owed for the portion of the shipment it carried out.

Central alleges that Jevic has collected at least $345,481.81 from customers for the benefit of Central. (Compl. ¶ 18). Central alleges that these funds are not property of the Debtors' estates under Bankruptcy Code § 541 because they are held in trust for the benefit of Central. This alleged trust relationship arises under the Third Circuit's Interline Trust Fund Doctrine, which was established in In re Penn Central Transportation Co., 486 F.2d 519 (3d Cir. 1993). That case, as discussed at length below, held that in limited instances a party which serves "merely as a receiving and transmitting agent" may be deemed to hold funds in trust for their rightful recipient; the funds do not become property of the estate of the receiving and transmitting party. The parties here agree that Penn Central's Interline Trust Fund Doctrine remains in force in this Circuit, but Jevic contends that the arrangement between Central and Jevic fails to meet the requirements for imposition of an interline trust fund.

## II.  **JURISDICTION AND VENUE**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## III.  **STANDARD OF REVIEW**

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits

3

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056.  The Court must view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party.  In re Elrod Holdings Corp., 394 B.R. 760, 763 (Bankr. D. Del. 2008).

In order to avoid summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  In re U.S. Wireless Corp., 386 B.R. 556 (Bankr. D. Del. 2008).  An issue of material fact is genuine if the factfinder could return a judgment for the nonmoving party on the disputed issue.  Elrod Holdings, 394 B.R. at 763.  If the nonmoving party fails to present facts establishing a genuine issue for trial, the moving party is entitled to summary judgment.  Id.  Thus, the Court must ask: "(1) is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?"  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3rd Cir. 1992) (quoting Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1060 (3d Cir. 1991)).

## IV.  DISCUSSION

A.   Legal Background

The general facts of the Penn Central case, which established the Interline Trust Fund Doctrine, are quite similar to the facts of this case.  In Penn Central, the Third Circuit was called upon to decide, in relevant part, "whether freight and passenger revenues earned by railroad carriers for interline

4

transportation or services but collected by Penn Central Transportation Company (Penn Central) in their behalf are held by it as trust funds . . . ."  486 F.2d at 520.  "Interline transportation or services" refers to the practice whereby "for example, a shipper or receiver pays one railroad for services of carriage for the entire shipment, although the shipment may travel over many different railroads . . . ."  Id. at 521.  The railroads, functioning "in many ways as a single system," created "interline accounts" to settle the balances owed to one another for those portions of the trip provided by some carrier other than the originating carrier.  Id. at 522.  Because Penn Central served "merely as a receiving and transmitting agent" on behalf of 39 other interline railroads to whom it owed interline balances, the court found that the funds held by Penn Central were held in trust for them.  Id. at 524.

The court in Penn Central found that common sense and traditional common law trust doctrines counseled in favor of such a result, considering the "intent of the parties, not only in terms of written documents, but also in terms of the conduct of the parties."  Id.  In absence of express intent to form a trust, the court looked to "the facts and circumstances surrounding the transaction and the relationship of the parties."  Id.  A fact the court found to be particularly significant was the lack of provision for the payment of interest.  That is, no interest accrued on the amount the railroads owed to one another on their interline balances.  This suggested a trust relationship rather

5

than a debtor-creditor relationship, which almost always requires that the debtor pay the creditor interest.  See Vess Oil Corp. v. SemCrude, L.P. (In re SemCrude, L.P.), 418 B.R. 98, 104-05 (Bankr. D. Del. 2009)(noting that absence of interest suggests a trust relationship).

The Third Circuit also considered several other traditional indicia of a trust relationship.  The factors the Penn Central court considered were later summarized by a court in this district as follows:

> (1) there is no provision for the payment of interest by the collecting carrier;
> (2) the collecting carrier does not commingle monies due to the other carrier with its general funds;
> (3) the carriers agree to apportion payments collected;
> (4) the amount the collecting carrier owes the other carrier directly relates to and depends upon the overall charge to the customer;
> (5) the collecting carrier must pay the other carrier only if the customer has paid it; and
> (6) the collecting carrier must pay the other carrier immediately upon settlement of the account, so that there is no "credit accommodation" for untimely payments.

In re Muma, 322 B.R. 541, 556-57 (Bankr. D. Del. 2005).  The court in Muma noted that "no single factor is determinative," and that courts should look to custom as well as to any relevant agreements between the parties to determine whether these factors are present.  Id.  If a trust relationship is found, the funds held in trust are not property of the debtor's estate, because Bankruptcy Code § 541(d) provides that "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the

6

estate . . . only to the extent of the debtor's legal title to
such property, but not to the extent of any equitable interest in
such property that the debtor does not hold."

Before applying the Penn Central factors to our facts, one
additional Third Circuit case deserves mention.  That case is
Columbia Gas, in which the Third Circuit found that the Interline
Trust Fund Doctrine applied to natural gas pipeline providers.
See In re Columbia Gas Systems, Inc., 997 F.2d 1039, 1066-67 (3d
Cir. 1993).  The Federal Energy Regulatory Commission ordered
that debtor Columbia Gas pass along to its customers refund
checks received from upstream gas suppliers.  Columbia, arguing
that these monies were held in trust and therefore were not
property of the estate, moved for permission to pay them to
customers. Applying Penn Central, the court allowed the payments.
It found that Columbia was merely a "receiving and transmitting
agent," or "conduit."  Id. at 1061.  Interpreting Penn Central,
the Columbia Gas court noted that an important consideration in
Penn Central was that the "interline balances did not represent
payments by one railroad to another for services rendered," but
were simply monies collected on one another's behalf.  Id. at
1060.

B.   Application

1.   Provision for the Payment of Interest

Courts have considered this the most significant factor in
distinguishing between a trust and a debtor-creditor
relationship.  The Columbia Gas court noted that "payment of

7

interest is the hallmark of the debtor-creditor relationship."
Id.  Jevic and Central do not dispute that there was no provision
for the payment of interest on any of the monies owed to Central.
This suggests a trust rather than a debtor-creditor relationship.

    2.    Commingling of Carrier Funds with General Funds

    The parties agree that Jevic commingled the amounts owed to
Central with its general funds.  This suggests that the funds
were not held in trust for Central's benefit.  Central argues
that "this factor carries no weight under these circumstances
because Jevic's credit facilities and other accommodations
required it to deposit all funds collected from customers in
designated lockbox accounts."  (Central Br. 16).  Even leaving
this explanation aside, courts have found the commingling factor
to be less significant than the other factors.  The Third Circuit
in Penn Central and Columbia Gas accorded it little weight.  The
Penn Central court cited the administrative burden that would be
imposed by segregating accounts in a complex and interconnected
cash management system.  486 F.2d at 525.  The Columbia Gas court
likewise found that separate accounts would have been a "huge
administrative burden," and accordingly attached "little
significance" to this factor.  997 F.2d at 1061.

    Jevic's controller testified that Jevic uses approximately
twenty to thirty carriers similar to Central.  (Alexander Dep.
41:3).  Administering separate accounts for each carrier would be
economically inefficient.  Because of this potential burden, and
in keeping with the Interline Trust Fund case law, this Court

accords little weight to the fact that Jevic commingled Central's funds with its general account.

    3. and 4. Apportionment and Relation to Customer Charge

    The third <u>Penn Central</u> factor, as phrased in the <u>Muma</u> decision, is whether "the carriers agree to apportion payments collected."  322 B.R. at 556.  The <u>Penn Central</u> court, in turn, appears to have derived this factor from a Southern District of New York case involving the Pennsylvania Railroad Company.  <u>See</u> <u>In re Chicago Express, Inc.</u>, 222 F. Supp. 566 (S.D.N.Y. 1963), <u>aff'd</u>, 322 F.2d 276 (2d Cir. 1964).  The court there found that "the relationship between the parties . . . was one of creditor and debtor, and not trustee and beneficiary," because, among other things, there was "absence of an agreement to apportion charges."  <u>Id.</u> at 572.  Notably, however, the amount due in that case was determined by "divisional sheets" according to the weight, volume, and distance of freight carried.  <u>Id.</u> at 568. Thus, the use of division sheets, taken alone, does not establish apportionment.  It appears, therefore, that "apportionment" is closely tied to the fourth factor, which is "whether the amount the collecting carrier owes the other carrier directly relates to and depends upon the overall charge to the customer."  322 B.R. 556.  Construing these two factors together, apportionment requires strict allocation of revenue, with the amount apportioned calculated as a percentage of the amount paid by the customer.  Where compensation to the non-collecting party is based on services it performs for the collecting party,

independent of the amounts charged to the customer, such arrangements are not apportionments at all, but are actually compensation for services rendered.  This would suggest a debtor-creditor relationship.

In the present case, revenues were split between Central and Jevic according to RMB D-83 sheets, which "split[] the revenue on a particular shipment between the carriers involved, based on mileage, origin, interchange, and destination."  (Alexander Dep. 43:10-13).  Although Central argues that this necessarily ties Central's compensation to Jevic's revenue from a particular shipment, the record is unclear about exactly how RMB D-83 sheets work.  The Court cannot say, based on the record, whether Jevic's revenue was used as a starting point, or whether Central's split was largely a function of the distance it carried freight, independent of (but likely correlated with) the total charge to the customer by Jevic.  The relevant clause of the Agreement provides only that "revenue splits will be determined on RMB D-83 series division sheets."[2]  (Agreement Addendum 2).  Because neither party has furnished the Court with an RMB D-83 sheet, the record is insufficient to conclude that no genuine issue of material fact remains with respect to apportionment and whether Central's compensation relates to and depends upon the overall

---

[2]    The Agreement also states that "the delivering carrier will never receive less than the D-83 minimum."  The parties have not advised the Court of the significance or meaning of that clause, though it appears to decouple Central's compensation from Jevic's total revenue.

charge to the customer.  Factors three and four are therefore
inconclusive or neutral.

    5.    Carrier Compensation in Absence of Customer Payment

    Factor five is whether "the collecting carrier must pay the
other carrier only if the customer has paid it."  In re Muma, 322
B.R. at 556-57.  The evidentiary record is contradictory on this
point.  Jevic notes that the Agreement contains "no obligation
requiring Jevic to pay Central when a customer failed to pay
Jevic." (Jevic. Resp. Br. ¶ 17).  Jevic argues that "[s]imply
put, the Interline Agreement required revenue splits.  Zero
revenue equals zero dollars to split." (Id. at ¶ 18).  On the
other hand, Central's President, Donald Orr, testified that Jevic
billed Central within three or four days of transferring goods to
Central at Central's terminals, before Jevic knew whether its
customers would pay as agreed. (Orr Dep. 20:1-3, Docket No. 43,
Ex. B).  Jevic's own controller testified that Jevic paid Central
regardless of whether the customer paid Jevic:

> Q:    You gave testimony before that on a particular
>     customer/shipper shipment with Central Freight being
>     the end carrier, Jevic would pay Central Freight their
>     split even if the customer didn't pay.
> A:    Yes.
> Q:    How do you know that?
> A:    Because it was -- I mean, we always carried accounts
>     receivable that we had for vendors -- or shippers,
>     accounts receivable, and it never interfaced or played
>     a part in determining when or whether a cartage agent
>     got paid. . . .  I was responsible for paying the
>     cartage vendors.  I had no idea whether a shipper paid
>     Jevic for a particular PRO.

Alexander Dep. 78:10-23, 79:1-3.  Given this conflicting
evidence, the Court cannot conclude that no genuine issue of

material fact exists with respect to this factor.  Like factors three and four, this factor is inconclusive.

    6.   Credit Accommodation

    The final factor is whether "the collecting carrier must pay the other carrier immediately upon settlement of the account, so that there is no 'credit accommodation' for untimely payments." Muma, 322 B.R. at 557.  Like several of the others, this factor originates in the Chicago Express case, and is cited in Penn Central.  See Penn Central, 486 F.2d at 526-27, quoting In re Chicago Express, Inc., 222 F. Supp. at 572.  The Chicago Express court found a debtor-creditor relationship existed rather than a trustee-beneficiary relationship, in part because payment was due the railroad within fifteen days of billing, and this arrangement was referred to in the relevant agreement as a "credit accommodation."  222. F. Supp. at 568.  The logical foundation for this factor seems to be that a time lag between invoice and right to payment is a common feature of a debtor-creditor relationship.

    Central notes, however, that in Penn Central, the court found a trustee-beneficiary relationship where up to 49 days could pass between performance and payment by the railroad.   But in that case, the 49 day lapse was between performance and delivery of invoice (or "abstract").  After shipment was completed, Penn Central was allowed until "the eighteenth day of the succeeding month" to send an "abstract" to the interline carrier detailing the amounts owed to it.  Penn Central, 486 F.2d

at 523.  Upon receipt of the abstract, the interline shipper
could then immediately draw a draft on Penn Central for the net
balance due for the month.  Id.  So although there was a time lag
between the interline carrier's performance and its right to
payment by Penn Central, there was none between its receipt of
invoice and right to payment; the interline carrier could collect
from Penn Central immediately upon "settlement of the account."
That is the relevant inquiry.

    The terms of payment between Jevic and Central were "45 days
of invoice."  (Alexander Dep. 66:16).  Invoices were generated
automatically and daily.  (Alexander Dep. 47:24, 66:13).  Thus 45
days elapsed between Central's receipt of an invoice from Jevic
and its right to payment.  Unlike the clause in Chicago Express,
this payment arrangement does not appear to have been referred to
explicitly as a "credit accommodation."  Nor does the Agreement
contain any covenants or warranties regarding Jevic's
creditworthiness, as the court found salient in Muma.  322 B.R.
at 557.  Nevertheless, the effect is the same: Central could not
collect from Jevic immediately upon "settlement of the account."
Though Central argues that provision for interest should be the
defining feature of a "credit accommodation," such a standard
would collapse the sixth factor with the first.  (Central Resp.
Br. ¶ 19).  This factor therefore weighs in favor of a debtor-
creditor rather than a trustee-beneficiary relationship.

## V.  **CONCLUSION**

Based upon the record before the Court, and application of
the <u>Penn Central</u> factors to the facts of this case, the Court
cannot conclude that no genuine issue of material fact remains
for trial.  Though it is undisputed that the first and most
important factor (lack of provision for interest) is satisfied,
the remaining five factors are each either inconclusive or weigh
against application of the Interline Trust Fund Doctrine and
granting of summary judgement.  The Motion will accordingly be
denied.  An appropriate order follows.


                              BY THE COURT:



                              _____
Dated:    Wilmington, Delaware     Brendan Linehan Shannon
          July 14, 2010            United States Bankruptcy Judge


                              14